# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 24, 2013 Session

## BRANDON COMPTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 93911    Mary Beth Leibowitz, Judge**

---

**No. E2013-00373-CCA-R3-PC - Filed November 12, 2013**

---

A jury convicted the Petitioner, Brandon Compton, of two counts of first degree murder. On direct appeal, this Court vacated the judgments of conviction and entered convictions for second degree murder, remanding to the trial court for resentencing. *State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *1 (Tenn. Crim. App., at Knoxville, Oct. 13, 2006) *perm. to app. denied* (Feb. 26, 2007). After the trial court resentenced the Petitioner to twenty-five years for each of his second degree murder convictions to be served consecutively, this Court affirmed the twenty-five year consecutive sentences. *State v. Brandon Compton*, No. E2007-01790-CCA-R3-CD, 2008 WL 4071825 (Tenn. Crim. App., at Knoxville, Sept. 2, 2008) *perm. app. denied* (Feb. 17, 2009). The Petitioner timely filed a petition seeking post-conviction relief on the basis of ineffective assistance of counsel, which the post-conviction court denied after a hearing. The Petitioner appeals the post-conviction court's denial, claiming that his attorney failed to: (1) adequately investigate witnesses, (2) present the theory of self-defense, (3) refute the State's characterization of the Petitioner as a drug dealer, and (4) present expert testimony on gunshot residue. After a thorough review of the record, the briefs, and relevant authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert L. Vogel, Knoxville, Tennessee, for the Appellant, Brandon Compton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

On direct appeal, this Court provided the following summary of the evidence from the Petitioner's trial in this case:

On June 13, 2003, the victim, Kellan Shown, contacted Timothy Williams about purchasing a pound of marijuana. Williams contacted the [Petitioner], who agreed to make the sale. It was agreed that the [Petitioner] would come to a house on Burwell Avenue where Williams was staying to complete the transaction. Also living in the house at the time were a number of individuals, including James and Marla Lindsey and David and Angie Talbot, as well as their families, including Lindsey's sixteen-year-old step-daughter, Whitney. Although not entirely clear from the record, most of these individuals, including the young children, were present on the evening of June 13th into the morning hours of June 14th, along with Whitney's boyfriend, Shane Cantor. Shortly before midnight, the [Petitioner] arrived at the house and was met on the porch by Williams. Williams then accompanied the [Petitioner] inside the house where a number of people were socializing and smoking marijuana in the living room. Prior to entering, the [Petitioner] and Williams noticed a car parked across the street from the house with three men inside, later identified as the two victims, Shown and Clayton Hall, and the driver of the vehicle, Charles Chandler. Williams commented that the individuals in the vehicle were acting funny, and, according to Lindsey, the [Petitioner] patted his side and said, "I ain't got nothin' to worry about." However, the [Petitioner] appeared calm during this encounter. Shortly thereafter, the two victims, whom the [Petitioner] had never met, entered the house, at which time the [Petitioner] proceeded to show Shown and Hall the marijuana. Upon agreeing to the purchase, Shown handed the [Petitioner] $1000. However, upon inspection of the money, the [Petitioner] thought that it looked suspicious and asked for a bowl of water. Whitney got the [Petitioner] some water, and he proceeded to dip the money into the water causing the ink to run. The [Petitioner] still remained calm and told the victims that apparently someone had given them counterfeit money. He then asked for his drugs back. The victim, FN1 still in possession of the marijuana, stood up and said, "Fuck it. I'm going home." Both Shown and Hall then proceeded toward the door with the marijuana. The [Petitioner] followed the pair down the hall and into a small foyer. Whitney was also in the hallway and was pushed out of the way. When Williams and Lindsey caught up with the

-2-

group, they saw the [Petitioner] with his gun drawn firing at the two victims. At least four shots were heard. Accordingly to Lindsey, the [Petitioner] said, "That's what you get for stealing my weed." Afterwards, the [Petitioner] retrieved the drugs and then ran out the back door and told everyone that they had not seen him there. The entire event took place in seconds. Once the [Petitioner] was gone, Lindsey began "freaking out" because the deceased were in plain view of the children. The bodies of the victims were then dragged outside the home, and the police were called.

> FN1. The record fails to establish whether it was the victim Shown or the victim Hall who was in possession of the drugs; however, it is clear that one of the victims stood up and prepared to leave with the marijuana.

Police recovered four shell casings in the area where the shooting occurred, as well as a bullet found in the living room which had gone through a wall. Additionally, Lindsey later found a fifth shell casing in a plant and called police to collect it as well. Two bullets were recovered from each of the victims during the autopsy. Moreover, investigators found five counterfeit one hundred dollar bills in Shown's pocket, as well as a small quantity of crack cocaine. No weapons were recovered at the scene. The occupants of the residence identified the [Petitioner] as the shooter, and police proceeded to search for him. Shortly thereafter, the [Petitioner] was arrested at his home without incident.

The autopsies revealed that each victim was shot twice, with each shot being capable of producing death, and each victim died as a result of the wounds received. Shown, age twenty-two, had two gunshot wounds on the left side of his body, one to the head and one to the back. Hall, age eighteen, was shot twice on the right side of his body, one wound to the cheek and one to the back. The medical examiner testified that each wound was a distant gunshot wound, meaning that the weapon was fired from at least three feet away.

The twenty-two year old [Petitioner] also testified at trial and admitted that, while he did maintain employment, his primary source of income was derived from selling drugs. He testified that he had gone to the house on Burwell that evening to sell marijuana to the victims. According to the [Petitioner], when he followed the victims into the foyer after they attempted to leave with his drugs, his gun was still in his pocket. He stated that he had gotten the nine millimeter pistol approximately one month earlier after his

uncle was robbed and shot. The [Petitioner] testified that he shot the victims in self-defense only after the victim Hall turned around in the foyer and fired at him. He testified that after the shootings he panicked, and, upon leaving the house, he picked up Hall's gun and the marijuana and fled.

*Compton*, 2006 WL 2924992, at *1-2. Based upon this evidence, the jury convicted the Petitioner of two counts of premeditated first degree murder and he was sentenced to serve two consecutive life sentences.

The Petitioner appealed his convictions and sentences, and this Court vacated the judgments of conviction and entered convictions for second degree murder, remanding to the trial court for resentencing. *Id.* at *1. On remand, the trial court imposed consecutive twenty-five-year sentences. The Petitioner appealed the sentences as excessive and this Court affirmed the trial court's judgments. *Compton*, 2008 WL 4071825 at *9.

The Petitioner then timely filed a post-conviction petition, claiming that he had received the ineffective assistance of counsel at trial. The Petitioner asserts on appeal that his attorney ("Counsel") failed to: (1) adequately investigate witnesses, (2) present to the jury the theory of self-defense, (3) refute the State's characterization of the Petitioner as a drug dealer, and (4) present expert testimony on gunshot residue. At the hearing on the petition, the parties presented the following evidence: The Petitioner testified that Counsel was appointed to represent him at the trial on his charges. The Petitioner expressed concern over the fact that, at the time, Counsel had never tried a first degree murder case. He said that, upon learning of Counsel's inexperience with first degree murder trials, he requested that the trial court appoint a new attorney to his case. The Petitioner said that the trial court denied this request, finding that Counsel was "competent enough to stand trial for [the Petitioner]."

The Petitioner testified that he did not believe that his motion to appoint new counsel affected his relationship with Counsel in any way. He stated that he and Counsel "communicated well" in preparation for his trial. The Petitioner was not satisfied, however, with the manner in which Counsel investigated the evidence in his case. He explained that he asked Counsel to speak with Chris Galloway, a man the Petitioner believed had "direct knowledge of someone who had seen another gun." According to the Petitioner, Counsel said that "it wasn't worth lookin' into" because Chris Galloway would likely "plead the Fifth." The Petitioner stated that although Mr. Galloway was not present at the shooting, the Petitioner took the gun used in the shooting and the victim's gun and stored the two weapons in Mr. Galloway's home after the shooting. The Petitioner said he was unaware of whether Counsel went to Mr. Galloway's home or ever spoke with Mr. Galloway.

The Petitioner testified that he could not recall whether Counsel discussed with him

-4-

available funds for hiring expert witnesses. He said that he met with "a guy and a girl" who asked him questions but neither of those persons testified at trial. He thought the man's name may have been "Michael Cohan." He said that Counsel never discussed with him any reports generated by these persons. He said that Counsel never mentioned going to the crime scene or whether Counsel employed an expert to review the crime scene.

The Petitioner testified that, during the trial, the victims were referred to "as boys" when they were "grown men." The Petitioner said he never discussed this reference to the victims with Counsel, but he believed Counsel should have objected to the use of the term "boys" to describe the victims. The Petitioner said that Counsel also should have objected to a description of the shooting as "execution style" because it was inaccurate. The Petitioner said that he did not discuss this error with Counsel during the trial but that he did talk with Counsel about it after the trial.

The Petitioner testified that one of the witnesses, Charles Chandler, testified inconsistently and that Counsel failed to impeach Mr. Chandler on the inconsistent testimony. The Petitioner was also concerned about a "teenage girl" who testified at trial as an eyewitness but was not a witness to the shooting. The Petitioner said that he told Counsel that the girl's mother, not the teenage girl, was present during the shooting, but "it never c[a]me up again."

The Petitioner testified that Counsel should have called a witness to testify that "more likely than not whenever there's a drug transaction . . . the buyer is normally - - especially when there's a robbery in progress is more likely than not going to be armed." The Petitioner admitted that he never spoke with Counsel about such a witness but, after the fact, believed this type of testimony "needed to be done."

The Petitioner testified that he was tested for gunshot residue but that the victims were not. He told Counsel that the victims should be tested as well to show that one of the victim's had fired a gun. Counsel never filed a motion requesting gunshot residue testing or raised the issue during the course of the trial.

The Petitioner testified that Counsel asked him inappropriate questions while he was on the witness stand. He explained that before trial, he told Counsel what he did for a living, but Counsel never put on any evidence to show that he had a lawful job. The Petitioner admitted that he "piddled and peddled in . . . drug sales" but maintained that being a drug dealer was not his "lifestyle." The Petitioner stated that he "kept a steady job" until he was incarcerated.

The Petitioner testified that he did not recall Counsel reviewing discovery with him

-5-

but that they did look at pictures of the crime scene and the victims. The Petitioner said that he did not know whether Counsel had been to the crime scene. He recalled reviewing the list of witnesses but did not know whether Counsel interviewed any of the witnesses. The Petitioner stated that, during the course of the trial, he understood "what was going on" procedurally. He said that the only advice Counsel gave him during the trial was to "sit there and draw on a piece of paper." The Petitioner agreed that he and Counsel later discussed what the Petitioner wrote on the paper during the trial.

The Petitioner testified that he had "a lot of respect for" Counsel, but he felt Counsel was inexperienced. The Petitioner said that Counsel never discussed a trial strategy with him. Further, he stated that Counsel did not attempt "to prove" self-defense.

On cross-examination, the Petitioner testified that Counsel represented him through his trial and appeal. The Petitioner agreed that Counsel was "a pretty good appellate lawyer" in light of the fact that his first degree murder convictions were overturned on appeal. He agreed that Counsel communicated well with him throughout the course of his representation.

The Petitioner maintained that Counsel was ineffective for failing to develop a self-defense theory at trial. The Petitioner agreed that he testified at trial and told the jury that he fired his gun to protect himself. The Petitioner further agreed that he did not tell the police, who questioned him an hour after the shooting, that one of the victims shot at him first. The Petitioner explained that he lied to police because he was "high" and "scared" when he spoke to them. The Petitioner testified that he was unaware of the numerous pre-trial motions Counsel filed in his case.

The Petitioner testified that Mr. Galloway would have testified that the Petitioner left his house with one gun and later returned with two. The Petitioner said that Mr. Galloway asked him about the source of the second gun, and the Petitioner "told him." The Petitioner agreed that Mr. Galloway would not know whether or not the victim had fired this second gun at the Petitioner. The Petitioner could not offer an explanation as to why the bullet he claimed was fired at him was found thirty inches above the floor in the wall where the victims fell when they were shot.

Counsel testified that he received the Petitioner's case from his law partner who, at the time, was transferring from private practice to the Public Defender's office. Michael Cohan, an investigator, had already been assigned to the case, so Counsel continued to use Mr. Cohan for any investigative work needed. Mr. Cohan had worked as a narcotics officer in Knox County and then became a private investigator. Counsel estimated that Mr. Cohan had investigated fifty or more capital cases, several hundred first degree murder cases, and thousands of less serious criminal cases.

Counsel testified that he met with the Petitioner "at least 20 times" while the Petitioner was incarcerated in the jail near Counsel's office. Counsel recalled that he and Mr. Cohan interviewed witnesses listed on the indictment and any witnesses discovered through other sources. If Counsel did not attend the interview, he was provided with and reviewed a memo summarizing the interview.

Counsel testified that the State was "very open" with discovery. He received witness statements "well in advance" of trial, allowing plenty of time to prepare for cross-examination. Counsel also reviewed all of the physical evidence in the case. Counsel said that he drove out to the crime scene but that the house had been remodeled after the shooting so he relied more heavily on the photographs taken at the time of the shooting. Counsel agreed that the crime scene had been compromised when the residents of the house moved the bodies. Counsel said that he addressed the alterations to the crime scene during his cross-examination of the crime scene technician.

Counsel testified regarding his contact with Chris Galloway. Counsel confirmed that he made contact with Mr. Galloway. Mr. Galloway spoke with Counsel briefly and then refused to speak with Counsel any further without the State's attorney being present. Mr. Galloway informed Counsel that he was represented by an attorney and that he believed his testimony would be harmful to the defense. Counsel said that he also spoke with the Petitioner's wife, and she had no information relevant to the incident.

Counsel testified that he did not recall discussing with the Petitioner gunshot residue testing for the victims. He said that he considered it, but he knew that the medical examiner would testify that any gunshot residue found on the victim's clothing would be consistent with the gunfire that killed them.

Counsel testified that a short time before the Petitioner's trial, the Petitioner wanted Counsel to seek a continuance. Counsel said that he did not have a legitimate reason to request a continuance and so the Petitioner asked Counsel to file a motion to withdraw. This motion was heard and denied several days before trial.

Counsel testified that the Petitioner's trial was the first time he had tried a murder case. Counsel explained his preparation in light of his inexperience with murder trials:

> I was - - scared is probably an accurate word to use at so – at some level, and because of that it was a motivator to – I didn't want to in any way disadvantage [the Petitioner], and I don't think it did. But I didn't want to embarrass myself either, and so I put in many, many hours into this case. I

know that I billed well over 100 hours for out-of-court time, and I didn't submit all of the hours that I worked. And then however many hours of in-court time we had as well. But I tried to investigat[e] every aspect of this case, whether it was fruitful or just ludicrous, in preparation.

Counsel testified that he never considered submitting the Petitioner's income tax returns to bolster the Petitioner's testimony that he was gainfully employed. Counsel said that he made the decision that it was best for the Petitioner to acknowledge on direct examination that he was a "small time drug dealer." Counsel explained that he made this decision because he did not want the jury to hear this information for the first time on cross-examination. Counsel denied ever characterizing the Petitioner's involvement with drug sales as the Petitioner's "criminal livelihood." He said that the first time this phrase was used was during sentencing in support of an enhancement factor.

On cross-examination, Counsel testified that he did not interview Officer Jan Gangwer, Officer Timothy Snodderly, Officer Samuel Brown, Officer M. Ivester, Officer T. Kesterson, Officer H. McGuffy, Officer Tomas Epps, or Officer Brian Davis, who were all listed on the indictment. Counsel said he was unable to make contact with another witness listed on the indictment, James Edward Lindsey, but he reviewed Mr. Lindsey's testimony from the preliminary hearing in preparation for trial. He said that he also did not make contact with Angela Lindsey, James Farr, or Shane Cantor but relied on their prior statements. Counsel could not recall whether the defense interviewed Timothy Williams and Charles Chandler, but he did not find a report or memo summarizing an interview with these persons in his file.

Counsel confirmed that he spoke with Mr. Chandler, and Mr. Chandler told Counsel that his testimony would not be favorable. Mr. Chandler told Counsel that he was out of town at the time of the shooting but, had he been in town, "he would have been able to prevent this offense." After speaking with Mr. Chandler, Counsel discussed this option with the Petitioner but expressed "reluctance" to call a witness that was "somewhat hostile" without knowing what the witness would say.

Counsel testified that he did not think a "gunshot expert" was necessary in this case because the Defendant testified as to his position and the victims' positions at the time of the shooting. His description of their locations in the room was consistent with that of the State's witnesses. Four of the five bullets were associated with the victims, and Counsel argued to the jury that a fifth bullet later found by the homeowner corroborated the Petitioner's testimony that one of the victims fired at him first. Counsel agreed that the Court likely would have granted a motion requesting the victims' clothing be tested for gunshot residue. Counsel said that the results could have bolstered the Petitioner's testimony but did

-8-

not agree that it would have changed the outcome of the trial.

On redirect examination, Counsel agreed that indictments often list many police officers that do not testify at trial because they do not have actual knowledge of relevant information. Counsel agreed that Officer Jan Gangwer, who he did not interview, was a crime scene technician whose role involved diagraming the crime scene. Counsel testified that he explored every avenue of defense that he thought was supported by the facts or evidence in this case.

Counsel identified the autopsy reports in this case and agreed that the medical examiner's description of the bullet paths indicated that the bullets entered the victims' backs.

In the order denying post-conviction relief, the post-conviction court noted inconsistencies in the Petitioner's allegations, such as his statement that Counsel never attempted to prove self-defense and then his admission that one of the victims "pulled a gun on him, and that he shot in self-defense." The post-conviction court also noted that it had instructed the jury on the theory of self-defense. The trial court implicitly accredited Counsel's testimony at the post-conviction hearing and explicitly credited Counsel's testimony that he "spent hours with [the Petitioner], his investigators, witnesses, and in preparation for trial." The post-conviction court concluded that Counsel had presented the theory of self-defense to the jury and "worked diligently to provide [the Petitioner] a defense . . . but the overwhelming physical evidence and testimony of witnesses convicted" him. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel. Specifically, he asserts that Counsel failed to: (1) adequately investigate witnesses, (2) present to the jury the theory of self-defense, (3) refute the State's characterization of the Petitioner as a drug dealer, and (4) present expert testimony on gunshot residue. The State responds that the Petitioner has failed to prove his factual allegations by clear and convincing evidence and that, therefore, the post-conviction court should be affirmed. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their

testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S.

at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Our review of the record reveals that the evidence does not preponderate against the trial court's findings. As to the Petitioner's assertion that Counsel failed to adequately interview witnesses in preparation for trial, Counsel testified that either he or his investigator interviewed all relevant witnesses listed on the indictment as well as witnesses brought to his attention during the course of their investigation of the case. Counsel agreed that he did not interview some of the witnesses listed on the indictment because they did not have relevant knowledge of the case. Counsel said that if he was unable to make contact with a witness, he reviewed the available statement or prior testimony of that witness in preparation for cross examination. Further, the Petitioner has failed to present any witness that he claims should have testified at trial in his defense. To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. We conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was deficient in his investigation of witnesses.

Next, the Petitioner complains that Counsel failed to sufficiently present to the jury that the Petitioner acted in self-defense. The Petitioner testified at the post-conviction hearing that he told the jury that he shot the victims only after one of the victims fired a gun at him. Counsel testified that he used the fifth bullet found at the crime scene to corroborate the Petitioner's testimony that he was first fired upon and, thus, he acted in self-defense. The medical examiner, however, testified about the position of the gunshot wounds on the victims which indicated that the victims were shot from behind, discrediting the theory of self-defense. The trial court, finding the issue of self-defense had been fairly raised, instructed the jury on this theory. The jury heard the Petitioner's assertion that he fired his gun in self-defense and, by its verdict, did not credit the Petitioner's testimony that he only fired his gun in self-defense. We conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was deficient in his presentation of self-defense.

The Petitioner argues that Counsel should have refuted the State's characterization of the Petitioner as a drug dealer. Counsel testified that he decided to elicit information regarding the Petitioner's reason for being present at the place of the shooting on direct examination. He said that he did not want the jury to hear about the Petitioner's involvement in the sale of drugs on cross-examination. Counsel made an informed, tactical decision about how to best present to the jury the Petitioner's involvement, limited or otherwise, in the sale of drugs. The Petitioner argues that Counsel should have presented income tax forms to evidence his lawful employment. We note, however, that the Petitioner's gainful employment does not disprove his involvement in a drug sale that resulted in his shooting and killing the two victims. Therefore, we cannot conclude that Counsel was deficient for not presenting the Petitioner's income tax forms to the jury or that the Petitioner's income tax forms would have changed the outcome of the trial.

Finally, the Petitioner asserts that Counsel was deficient for failing to hire a forensic expert to testify about gunshot residue and the crime scene. As discussed earlier, we will not speculate as to what a potential witness might testify. To prevail on a claim that Counsel was ineffective for failing to present a witness, the Petitioner should present the witness at the post-conviction hearing so as to allow the trial court and this Court to fully evaluate any prejudice caused due to the absence of such testimony at trial. We have no way of knowing what an expert witness would have testified to in this regard. Therefore, the Petitioner has not proven by clear and convincing evidence that Counsel was deficient for failing to call an expert witness on gunshot residue.

Accordingly, we conclude that the post-conviction court did not err when it denied relief. The Petitioner failed to show that Counsel's representation was ineffective and that he was prejudiced by Counsel's representation. The Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE